Preliminary Injunction. So I'd like to start basically by kind of backing up and discussing what is the purpose of a preliminary injunction. A preliminary injunction is for the purpose of preliminarily protecting against the threat of a specific irreparable harm. That in a to do. For that reason, it is also supposed to be reasonably tailored, narrowly tailored to actually prevent the specific irreparable harm that is alleged. And it is not supposed to enjoin all possible breaches of the law. It is designed to maintain the status quo. So in a trade secrets case, which is what this case is about, it is appropriate to issue an injunction, assuming that the elements are shown, that is narrowly drawn to protect against the trade secret, the use or disclosure of the trade secret pending the resolution of the case. And if that is what the order in this case did, we likely would not be appealing, at least not on behalf of all three of the defendants, which I'll come to in a moment. So counsel, can I ask you about that? So it sounds like from what you just said that there might be a preliminary injunction that would be appropriate. What would that preliminary injunction look like, do you think? Yes, your honor. So the preliminary injunction would be against Stephen Rechenmacher. Stephen Rechenmacher is the defendant who actually communicated information that is admittedly related to ANOVA to ODATA prior to coming to work for ODATA. It would be against Mr. Rechenmacher only for a reason I'll explain in just a second. And it would be limited to the customers. It would prohibit solicitation from the customers for which there was some evidence that the trade secrets were either used in connection with some form of solicitation. So in our brief, there are a lot of numbers in the brief. We start with 181 companies that are on ANOVA's list that the district court adopted for the injunction. 122 of those customers were already on ODATA's customer list prior to them ever meeting Stephen Rechenmacher. And then even within that 122, 42 of those customers were actually doing business with ODATA prior to any connection with Mr. Rechenmacher. From there, you jump down and there was actually evidence in terms of names of companies, of 22 companies that Mr. Rechenmacher disclosed information about to ODATA. And within that 22, there were seven that were shown to have some potential suggestion of solicitation. So the injunction against Mr. Rechenmacher, Stephen Rechenmacher only, would be to enjoin the solicitation of those seven customers. Why wouldn't it also go to ODATA because he provided the information to ODATA? Well, there was, that's probably fair, your honor. The reason on the likelihood of success on the merits, the reason ODATA is different is the lack of likelihood of irreparable harm. And that's why I should have come to, and I apologize, I didn't come to it sooner. You'll recall that there was a spoliation finding made by Judge Roberts and that spoliation finding, which we do appeal from, basically said that because Mr. Rechenmacher had deleted the information that Inova's counsel had asked him to delete, that that somehow constituted spoliation. We argue it's not spoliation because Inova's counsel asked him to delete it and gave him the express alternative of either deleting it or turning it. And they used the word or multiple times in their letters. But even if you were to assume that the spoliation finding against Mr. Steven Rechenmacher was valid, which it wasn't, but if you assumed it, there's no finding of spoliation by ODATA or Brian Rechenmacher. So when you get to ODATA, ODATA no longer has any of the information and its possession, custody or control other than in my hand. It is in my hand because they preserved it. It's on a USB drive, but they don't have any of the information and their possession, custody or control after approximately mid-January. So there's no danger of them using it. So for ODATA, while I would agree with your honor on the first elements of a preliminary injunction as to those seven companies and those seven companies only, I wouldn't on irreparable harm. Your time, I think you're keeping six minutes, so you don't have much time. So I'm a little surprised that you actually are saying that we should keep any solicitation injunction because in theory, in theory, the the first of the two does all the work if you guys were to obey it right and not use to not use the trade secret information to actually solicit anybody. And so in theory, you don't need the second injunction. So I'm a little surprised that you're almost like you're acknowledging the solicitation injunction seems to me to be Judge Jones not trusting your clients. And there seems to be some reason for him not trusting your clients. Your clients came in and like and said stuff and then actually had to change their briefing and some affidavits because it turned out that stuff wasn't true. And so that really is sort of the difficult. That's the only difficult issue in this case is he doesn't trust you guys. So he says don't solicit. And it's a very broad solicitation injunction. I get that. I don't think the solicitation injunction is necessary. If if he or we trusted that you would actually obey the other injunction. But there's a reason for his lack of trust. I'll keep going, Your Honor, and I recognize that I'm going into my six minutes. But I think this is important. Yes, you're not in your six minutes. You still have eight and a half, eight and a half. But go ahead. OK, sorry that I may get into the six minutes. That's exactly right, Your Honor. And to be frank, that's why we are essentially conceding. On the issue of Stephen Rackenmacher. But for a much narrower scope of the injunction, if it was the Gallagher case is kind of a good example. The Gallagher case is a situation where the Ninth Circuit did say that an anti solicitation injunction was appropriate, but it had to be narrowly tailored to only those customers. And in fact, in that case, it was one customer called in CBC narrowly tailored to only that customer, for which there was some evidence that the information at issue was used to solicit. There were nine other customers where there was no such evidence. And the court said the injunction cannot be in place with respect to those other nine companies. So if I had to just say why, I just said what I said a minute ago. It's really the Gallagher case. But Your Honor is correct that under the retirement group versus Galante case as a different form of example, you don't need an anti solicitation provision at all as long as you have the non use of trade secret. And we trust and we trust your clients will actually follow it. That's the challenge here. How can we do that? That's that's correct, Your Honor. You have to have some level. And I feel like I'm getting punished for actually conceding the argument. You're now making your own. No, no, no. You're being honest. I appreciate that. Yes, that's why I don't argue that the entire thing should be stricken. We've been careful not to over read. Not. If I read the record at some point, you were engaged in discovery and other things. And the district court said that he would entertain motions to add or exclude from the number of parties that you were barred from soliciting. Was was there a request to the district court just procedurally? I'm not that familiar with the record. That they that they strike some of those people that customers that were part of the solicitation, Dan? Yes, Your Honor. And I will go into the six minutes here because it's important. Yes, Your Honor, there was a motion filed with the district court fairly soon after the injunction was issued because counsel for Inova and I had been meeting and conferring. And even Inova's counsel had agreed to remove 18 names from the list. But then as soon as the preliminary injunction was issued, they would not agree to remove any from the list. We filed a motion to the district court. The district court initially refused to hear it at all on the grounds that we appealed and actually this court in an order dated May 18, 2020 told the district court that it had, quote, aired in concluding that it lacked jurisdiction to modify the preliminary injunction while it is on appeal, unquote. That order was communicated to the district court and the district court still has not even entertained our motion. So I think it's fair to say we did try earnestly. And it just hasn't gone anywhere. And now I will reserve time if I may. Okay. Yeah, time reserved. Mr. Duggan. Good morning, Your Honors. I thank you for your time this morning. I think it's important and I'm here on behalf, of course, of the plaintiff Inova. I think it's important to- That's right. That's correct, Your Honor. And I think it's important to start with the facts here, Your Honors. I think that Judge Jones did a very good and thorough job of marshalling the facts that were presented to him. And this is an unusual case, I think. It's also a case that Judge Jones recognized was a smoking gun type of case. And let me explain what that means. This was a situation where my client, on the eve of his- They're two- Some of the two most senior salespeople, Stephen and Brian Reckenmacher, leaving to go work for a competitor. On the eve of that, my client discovered that, in fact, Stephen Reckenmacher had been sending information to his ODATA account and to his personal account. And we- That led to the cease and desist letters. And it led to the discovery of additional information. It became clear that Stephen Reckenmacher and Brian Reckenmacher, who are a father-son team, they work together out of the same location, had been in communication with ODATA for many months before they left. They left on December- They resigned on December 23rd. They had been in communication with ODATA since at least September. And in the course of those communications, and this is all record evidence, the Reckenmachers, and specifically Stephen Reckenmacher, had sent information to ODATA that was clearly a proprietary information of my client. It was not public information pertaining to a number of customers, not just seven customers, but well over 40 customers. When you add it all together, there was quite a few customers that were involved in this information that Mr. Reckenmacher sent. In addition to that, it was very clear from the record that ODATA had known that Mr. Reckenmacher would be sharing this information because ODATA and the Reckenmachers entered into a confidentiality agreement in which Reckenmacher told them that he'd be giving them confidential information. Now, of course, the only confidential information Reckenmacher had was Inova's information. He didn't have his own confidential information to share. So it was clear that ODATA and the Reckenmachers, specifically Stephen, but his son works with him, together, essentially misappropriated information of my client, clearly did, and there's record evidence of that. We actually submitted a lot of that information in the record before the district court, and also used that information. There was record evidence that the district court relied on that Stephen Reckenmacher had met with Inova clients on two occasions and had referenced information that he had sent to ODATA, specifically information about deployment of tanks as an oil tank business, a tank monitoring business, information about the deployment of oil tanks and monitoring devices on those tanks that Inova was using, information about when Inova's oil tanks or monitoring devices would sunset, would become obsolete, which is, again, different for every device. It's not public information when this information is, when these devices are going to become obsolete. That information is very valuable to ODATA because ODATA wants to go to those customers, and did, and say, look, your Inova device is about to expire. Why don't you replace it with one of our devices? So the exact timing of when these devices would expire was, of course, very important to ODATA to learn, and Mr. Reckenmacher shared that information with them. There was also evidence that both Reckenmachers accessed proprietary databases of Inova before they left to join ODATA, and specifically, we saw that some of those databases, it appears Mr. Reckenmacher printed information out and sent it by email to the CEO and senior sales director of ODATA. So we saw information of access for inappropriate use. We saw evidence of sending the information. We saw evidence of using the information. Now, did that pertain to all of the customers on the injunction list? It did not. As I said, it pertained to a substantial number of them, but the reason why the injunction list came to be what it was, was that we were attempting to capture those customers that the Reckenmachers either were responsible for, in other words, they were paid based on sales to those customers, they were in their territory, or they were in customers about whom they had gained information that they had then shared with ODATA. So when we looked at the customers that Inova has, I mean, the Reckenmachers are very senior employees responsible for the entire western region of the country. They have a lot of customers. The intent was to include those customers, the ones that the Reckenmachers had and used, were most likely to use information regarding, to target those customers for the anti-solicitation directive. Now, the court did say that to the extent that there were ODATA customers, substantial ODATA customers on that list, that ODATA should provide evidence of that and that we could negotiate that list. And if necessary, there'd be additional motion practice before the district court. The motion practice that my adversary referred to did not really result from a full record. It resulted from a selection of a few emails and other documents that really didn't show substantial business. And as a result, that motion was denied. Now, he can always revisit the issue. We're still in discovery. Discovery's been going on for a number of months. There's no reason why he couldn't revisit the issue before the district court. I think the district court would be open to that. And we can obviously have negotiations. I'm just trying to underscore. Mr. Dugan, let me ask you about, so you're 180 folks. You acknowledge there's people on there that were previously customers of ODATA? Actually, I don't acknowledge that because I don't believe that ODATA has established that in the evidence that they put forward when they brought their motion, which, by the way, they brought two days after the injunction order was issued. So what they really did was they selectively provided some information, a couple of invoices, some emails about a desire to do this. Do you acknowledge that there's, you know, I think you said earlier that these were all clients of the Redenbachers. Redenbachers hadn't served all 181 of those folks when they worked at, they hadn't bought from them when they, not all of them, when they bought, when they worked at your company, your representative. Well, your honor, the evidence that we have is that, in fact, when those customers purchased Innova products, the Redenbachers did earn commissions from those purchases. That's why they were Redenbacher clients. We don't, I mean, when this preliminary injunction was entered, obviously, we're at the beginning of the case and we're not at the end. So we're not in a position to say with authority, you know, how many of those 181, there was never any business done with. But the idea was to capture the ones that they were responsible for. That was the entire. Here's the challenge in this case. I think you have a very overbroad injunction. You do. You pretty much acknowledged that when you were in front of the district court, when you're in front of Judge Jones. He asked about, well, what if the order is so broad it's covering existing clients? And then you said, well, by definition, I think it would only pertain to those customers that they serviced and that Innova customers that weren't currently ODATA customers. But once you got the injunction from Judge Jones and he sort of walked away, I think you were happy to have this overbroad injunction. And so you, I mean, the problem is you've got an overbroad injunction. These guys did some bad things. Judge Jones did what he has a tendency to do and sort of gave justice. But injunctions aren't to punish people, right? So that's the problem. You have this overbroad injunction and you basically stopped dealing, even though Judge Jones told you to deal with them, essentially. He actually, you know, he told you to go figure out with them this, right? And you're just basically, it's good for your client to have them not be able to talk to any of these 181 clients. And so you're just sitting on it as long as you can. Well, Your Honor, I don't agree with that. Let me be very clear about this. Literally the day after that injunction came out, ODATA's counsel said, we want you to take 130 names off the list, provided no evidence of why. No evidence of why. It's just that we'd like you to do it. And the reason they said is because, well, most of them aren't Reckon Mocker clients. They didn't provide any evidence of that either. We have evidence they were Reckon Mocker clients. They didn't have evidence they weren't other than their say-so. So were we supposed to say, okay, we'll accept your say-so? I mean, no, we... Your Honor, this is Judge Fletcher. Sorry. As I understand the case, it's not only the clients of the two Reckon Mockers, but it's also, they also got information as to other clients that weren't their own with respect to sunset data for particular devices. Is that right? Or was it only as to their own clients? Well, the list is primarily the clients that were serviced by the Reckon Mockers. There are some clients that they had information, they took information concerning that are on that list as well. But they're mostly the client, the Reckon Mockers clients. But as to some of those, as to those that are not Reckon Mocker clients, did they transmit information about those clients that would be useful to photo data that is confidential information? Yes, they did. Those are... There's 17 Canadian clients. We have a document that actually embodies the information that they sent. 17 or so Canadian clients. I might be slightly off on the number. That were not Reckon Mocker clients. Judge Jones is sort of who bears the burden of proof as to what's been transmitted or what's not been transmitted. And sort of what do you... If you're going to be safe on one side or the other, on whose side do you call it safe? Well, Your Honour, if I could. There are other cases, the Ninth Circuit, and particularly my system's MAI, which have upheld injunctions against soliciting clients in situations where there is evidence of misconduct and the misappropriation of trade secrets. The Gallagher case that my adversary refers to is a case specifically where there was no evidence, except circumstantial evidence, of misappropriation of customer information. The same is true with the Galante case, as well. Those are cases where the evidence of wrongdoing was lacking. Not to suggest that this is an injunction intended to punish. However, where a former employee, in contravention of his clear and known duties, does intend to harm his former employer in the aid of a new employer, that is conduct that can appropriately be enjoined. The imminent harm there is palpable. And there are cases that recognize that, including my systems, including a case that the district court relied on in the Second Circuit. Doesn't everybody who, I mean, if you take a new job with another competitor, I mean, what's the difference between harm and just competing against your former employer? It seems to me that's not built in. No, I don't think in every case  and, as the evidence here suggested, tells their current employer's customers, why don't you buy some stuff from Oda Data? In fact, they're part of our company. There's an email, it's part of the record, in which a Reckonmacher says that. I mean, that's not normal and typical employee leaving conduct. That is misconduct. Yes, there's a lot of problems here, including that Reckonmachers were, it looks to me like for several months when they were receiving a paycheck from Inova, they were actually soliciting folks for their future employer. One question I've got about this is we've got this, this stage of the case is all about these injunctions and are they overbroad and such, but am I right in thinking that, I mean, there's gonna be a lawsuit about the damages, this lawsuit's gonna continue on, it's gonna be a lawsuit about the damages that your client has suffered from not just these activities, but what they were doing during the time when they were working for your client while they were actually helping. Is that all gonna be, I mean, there's going to be a lawsuit where presumably you're gonna make the case that they owe, that they owe, that both the Reckonmachers and Odidad owe your client money for all of this, is that right? Not just injunction, but money. Well, the lawsuit is continuing and it will ultimately cover the topic of damages to the extent there were damages caused by the conduct. Well, excuse me, I don't quite understand why you can't just all sit down and straighten this out. Judge Jones seems to want to enter an injunction that covers the proper territory and recognizes that this may be too broad. Are you taking the position before Judge Jones that he shouldn't do anything until we do something or what's keeping you from just sitting down maybe with the judge and narrowing the injunction? Well, Your Honor, nothing's keeping me. I think that same question could be asked of the other side. I mean, they clearly have the incentive to do that as well. They claim that they have made that motion. However, as I said, that motion that they claim they made was made literally the day after the injunction was entered on almost no evidence and it was largely on their say-so. So to the extent that we want to look at what the evidence is of who the customers are and the like, obviously that is something the respondents are perfectly capable of advancing. There's nothing stopping them either. But that's not exactly true, Mr. Duggan, because they went to Judge Jones right afterwards, which I think just shows diligence. They said, you know, because Judge Jones had sent all kinds of signals that this is sort of an overbroad list, but we're going to narrow it down. And then you guys opposed that. And then Judge Jones waited until they said, we're going to appeal. They didn't appeal for like a month or something. Then they started an emergency appeal. Then Judge Jones after that said, well, I can't do anything because my hands are tied. Then our court said, no, your hands aren't tied. And Judge Jones just sat on it. So I don't think you can say that they haven't been diligent in trying to get this narrowed. I think what's more accurate is that once you got the injunction, that you were very happy to just sit there and wait until Judge Jones takes action. Your Honor, if I can, I know my time is up, but if I can just respond to that question. They had an opportunity to put in a lot of evidence to support their position. They put in almost none. Your Honor, we have to grapple with the evidence. They have the evidence if they want to, to put in, but they didn't put it in. There was very little evidence and there was not evidence supporting the position they're taking now, which is most of the customers shouldn't be on the list. I'm sorry, Your Honor, for going over. Thank you. Any further questions from the bench? All right, thank you very much. So you've saved some time, Mr. Smith. Thank you very much, Your Honor. Let me address immediately the last point that was made. That we supposedly never put on any evidence. That's simply false. There's an unrebutted two different declarations from Andre Boulay, where he goes through the clients that were OData clients long before they ever met the Reckonmachers. He attaches, he declares in that every single name at issue, which is over 42 clients. He then states with respect to the largest of those clients, what the actual volume of business was in a paragraph for both of those declarations. He then attaches to both of those declarations invoice after invoice after invoice. It's not a, Mr. Duggan said, quote, couple invoices. It's something like 30 invoices, not a couple of invoices. And it corroborates every statement made in Mr. Boulay's declaration. So there was that evidence. In addition, we put in the evidence of our customer list, which has thousands of names on it. These customer lists, they were authenticated and it was declared that they were obtained from publicly available sources where you get these customer lists. And the most common of those are trade show lists in this business. This is the tank monitoring business. So they have trade shows around North America from time to time. And you basically buy a list of who's attending. That list shows that 122 of the names out of the 181, and we cite to the excerpts of record where this is shown, are on this list. So there was plenty of evidence. And at no point in time did ANOVA actually contest any single part of it. So there is plenty of evidence in the record on this issue. And we were diligent in terms of presenting it to the court. Mr. Smith, can I get you to, what I'm trying to get my head around is how impactful is it to your client, this 181? Because it does seem like it's overbroad. You've been, this injunction went in earlier this year, I guess early in the year, like February or January or something? It went in, the first one, I think went in in late February, the TRO that was- So you haven't been able to, your client, I'm assuming, is following the injunction. And so it's basically like hands off, not talking to 181 potential customers, some of which were former clients. What portion of your client's customer base is that, are these bigger clients, smaller clients? Most of them are actually not bigger, Your Honor. That's why we had a separate paragraph in Mr. Boulay's declaration at the beginning of his declaration, it's I think paragraph three or four, where he lays out the biggest ones to show that those are the ones that are the most impactful. But a lot of these 181 companies are admittedly small, at least we believe, and my clients told me they're small. So, but with respect to the large ones, yes, it is impactful. So it's kind of one of those situations where it's not the number that's all large, it's some within that number are incredibly important. In addition, Your Honor, I'd like to make this point that Mr. Dugan said that the Reckonmachers either serviced or received money or commission from these clients. But if you actually look at the title of the document, the list, it says list of Inova customers who the Reckonmachers serviced or whose name became known to the Reckonmachers during their employment with Inova and or through their misappropriation of Inova's confidential and trade secret information, names who became known to. And in fact, we did meet and confer with Mr. Dugan about this. We sent a letter to, I sent a letter to him where I listed that all of these clients whose names became known to the Reckonmachers that the vast majority of them were not clients that the Reckonmachers ever serviced at all. What is it, Mr. Smith, what is it that you want this court to do? To reverse and remand with directions if the district court is going to issue some kind of injunction that we actually do this process. I've tried to do this process both before the order was issued and after the order was issued. This court even told District Court Jones that he had erred in concluding that he didn't have jurisdiction to do it. Even then, he didn't consider it. So I do think we were diligent. So it should be reversed for the reasons stated in our brief, but with instructions to reconsider the issue if some injunction is appropriate. With my 15 seconds left, though, I would say there's no injunction that's appropriate against Brian Reckonmacher. And there really shouldn't be any injunction beyond the trade secret injunction itself against ODATA. Can I ask you about that? Without your audit. Yes, sure. Can I ask about the Brian Reckonmacher? So why, you know, you've emphasized that here. You emphasized that in the briefs. Why do you care that Brian Reckonmacher not be covered by the injunction? I mean, at least an injunction that said don't, let's say, don't share the trade secrets. Why do you care? I mean, he would be, it almost sounds a little suspicious that you, oh, we really want this other person not to be covered by it. What's your reason for that? The main reason is I'm his lawyer, Your Honor. I agree with, if you're making the point that if he's working for ODATA, it doesn't make much make a difference if there's still an injunction against ODATA. I agree with that, Your Honor. But he may decide to quit and not work for ODATA someday. And I just am in the unfortunate position of representing all three defendants. And I feel like it is my obligation. So that's the last argument in the brief. It is my obligation on behalf of Brian Reckonmacher to say there simply wasn't any evidence against him. The only evidence against him was that he looked at ANOVA information before he quit. That's it. But I see your point, Your Honor. Is Brian working now for ODATA? Yes, Brian and Stephen are still working for ODATA. But they can't do much. Given the relationship between father and son, and the facts that we know that the injunction against Brian is perfectly warranted. Yeah. Isn't Brian like, yeah, that's why I was asked to quit. Brian's like is in his father's house or something working, right? Like they work like very closely. They do work very closely. I don't know if he's literally in his house. But yes, I can see that they work as a team up to this point in time. But I see your point about if he was to go to work for somebody else, that, okay, I apologize. Right. Revise the injunction to say for so long as he worked for ODATA. But while he's working for ODATA, I see no grounds for keeping Brian out of the injunction. That may be fair, Your Honor. Again, I wasn't trying to say that in the context of ODATA, whatever the injunction is against ODATA that might be fair, which would be either no injunction or a much narrower injunction. Brian as ODATA, I agree. I don't, I don't. And I'm not, and I wasn't trying to make that distinction. Okay, thank you. Okay, any further questions from the bench? Okay, thank both sides for their argument. Independent technologies versus ODATA wireless network submitted for decision. Thanks very much. Thank you, Your Honors. Thank you, counsel. Thank you, Your Honor. Preliminary injunction. So I'd like to start basically by kind of backing up and discussing what is the purpose of a preliminary injunction. A preliminary injunction is for the purpose of preliminarily protecting against the threat of a specific irreparable harm. That in a nutshell is what it is designed to do. For that reason, it is also supposed to be reasonably tailored, narrowly tailored to actually prevent the specific irreparable harm that is alleged. And it is not supposed to enjoin all possible possible breaches of the law. It is designed to maintain the status quo. So in a trade secrets case, which is what this case is about, it is appropriate to issue an injunction, assuming that the elements are shown, that is narrowly drawn to protect against the trade secret, the use or disclosure of the trade secret pending the resolution of the case. And if that is what the order in this case did, we likely would not be appealing, at least not on behalf of all three of the defendants, which I'll come to in a moment. So counsel, can I ask you about that? So it sounds like from what you just said that there might be a preliminary injunction that would be appropriate. What would that preliminary injunction look like, do you think? Yes. Yes, Your Honor. So the preliminary injunction would be against Stephen Rechenmacher. Stephen Rechenmacher is the defendant who actually communicated information that is admittedly related to ANOVA to ODATA prior to coming to work for ODATA. It would be against Mr. Rechenmacher only for a reason I'll explain in just a second. And it would be limited to the customers. It would prohibit solicitation from the customers for which there was some evidence that the trade secrets were either used or in connection with some form of solicitation. So in our brief, there are a lot of numbers in the brief. There are a hundred, we start with 181 companies that are on ANOVA's list that the district court adopted for the injunction. 122 of those customers were already on ODATA's customer list prior to them ever meeting Stephen Rechenmacher. And then even within that 122, 42 of those customers were actually doing business with ODATA prior to any connection with Mr. Rechenmacher. From there, you jump down and there was actually evidence in terms of names of companies of 22 companies that Mr. Rechenmacher disclosed information about to ODATA. And within that 22, there were seven that were shown to have some potential suggestion of solicitation. So the injunction against Mr. Rechenmacher, Stephen Rechenmacher only, would be to enjoin the solicitation of those seven customers. Why wouldn't it also buy through ODATA because I mean, he provided the information to ODATA. Well, there was, that's probably fair, your honor. The reason on the likelihood of success on the merits, the reason ODATA is different is the lack of likelihood of irreparable harm. And that's why I should have come to, and I apologize, I didn't come to it sooner. You'll recall that there was a spoliation finding made by Judge Roberts. And that spoliation finding, which we do appeal from, basically said that because Mr. Rechenmacher had deleted the information that Inova's counsel had asked him to delete, that that somehow constituted spoliation. We argue it's not spoliation because Inova's counsel asked him to delete it and gave him the express alternative of either deleting it or turning it. And they used the word or multiple times in their letters. But even if you were to assume that the spoliation finding against Mr. Steven Rechenmacher was valid, which it wasn't, but if you assumed it, there's no finding of spoliation by ODATA or Brian Rechenmacher. So when you get to ODATA, ODATA no longer has any of the information and its possession, custody, or control other than in my hand. It is in my hand because they preserved it. It's on a USB drive, but they don't have any of the information and their possession, custody, or control after approximately mid-January. So there's no danger of them using it. So for ODATA, while I would agree with your honor on the first elements of a preliminary injunction as to those seven companies and those seven companies only, I wouldn't on irreparable harm. Your time, I think you're trying, you're keeping six minutes, so you don't have much time. So I'm a little surprised that you actually are saying that we should keep any solicitation injunction because in theory, in theory, the first of the two does all the work if you guys were to obey it, right? And to not use the trade secret information to actually solicit anybody. And so in theory, you don't need the second injunction. So I'm a little surprised that it's almost like you're acknowledging the solicitation injunction seems to me to be Judge Jones not trusting your clients. And there seems to be some reason for him not trusting your clients. Your clients came in and said stuff and then actually had to change their briefing and some affidavits because it turned out that stuff wasn't true. And so that really is sort of the difficult, that's the only difficult issue in this case is he doesn't trust you guys. So he says, don't solicit. And it's a very broad solicitation injunction. I get that. I don't think the solicitation injunction is necessary if he or we trusted that you would actually obey the other injunction. But there's a reason for his lack of trust. I'll keep going, Your Honor. And I recognize that I'm going into my six minutes, but I think this is important. Yes, you're not in your six minutes. You still have eight and a half, eight and a half, but go ahead. OK, sorry that I may get into the six minutes. That's exactly right, Your Honor. And to be frank, that's why we are essentially conceding on the issue of Stephen Reckenmacher, but for a much narrower scope of the injunction. If it was the Gallagher case is kind of a good example. The Gallagher case is a situation where the Ninth Circuit did say that an anti-solicitation injunction was appropriate, but it had to be narrowly tailored to only those customers. And in fact, in that case, it was one customer called NCBC. Narrowly tailored to only that customer for which there was some evidence that the information at issue was used to solicit. There were nine other customers where there was no such evidence, and the court said the injunction cannot be in place with respect to those other nine companies. So if I had to just say why I just said what I said a minute ago, it's really the Gallagher case. But Your Honor is correct that under the retirement group versus Galante case as a different form of example, you don't need an anti-solicitation provision at all as long as you have the non-use-of-trade-secret provision. And we trust your clients will actually follow it. That's the challenge here. How can we do that? That's correct, Your Honor. You have to have some level. And I feel like I'm getting punished for actually conceding the argument you're now making, Your Honor. No, no, you're being honest. I appreciate that. Yes. But that's why I don't argue that the entire thing should be stricken. We've been careful not to over- If I read the record, at some point, you were engaged in discovery and other things. And the district court said that he would entertain motions to add or exclude from the number of parties that you were barred from soliciting. Was there a request to the district court, which is procedurally, I'm not that familiar with the record, that they strike some of those people, customers that were part of the solicitation ban? Yes, Your Honor. And I will go into the 60 minutes here because it's important. Yes, Your Honor, there was a motion filed with the district court fairly soon after the injunction was issued because counsel for Inova and I had been meeting and conferring. And even Inova's counsel had agreed to remove 18 names from the list. But then as soon as the preliminary injunction was issued, they would not agree to remove any from the list. We filed a motion to the district court. The district court initially refused to hear it at all on the grounds that we appealed. And actually, this court, in an order dated May 18, 2020, told the district court that it had, quote, erred in concluding that it lacked a jurisdiction to modify the preliminary injunction while it is on appeal, unquote. That order was communicated to the district court and the district court still has not even entertained our motion. So I think it's fair to say we did try earnestly and it just hasn't gone anywhere. And now I will reserve time, if I may. Okay. Yeah, time reserved. Mr. Duggan. Good morning, Your Honours. Thank you for your time this morning. I think it's important, and I'm here on behalf, of course, of the plaintiff, Inova. I think it's important to... And I'm not sure your name here on the sheet. Mr. James Duggan, right? That's right. That's correct, Your Honour. Okay. And I think it's important to start with the facts here, Your Honours. I think that Judge Jones did a very good and thorough job of marshalling the facts that were presented to him. And this is an unusual case, I think. It's also a case that Judge Jones recognized was a smoking gun type of case. And let me explain what that means. This was a situation where my client, on the eve of his... Some of the two most senior salespeople, Stephen and Brian Reckenmacher, leaving to go work for a competitor. On the eve of that, my client discovered that, in fact, Stephen Reckenmacher had been sending information to his ODATA data account and to his personal account. And that led to the cease and desist letters. And it led to the discovery of additional information. It became clear that Stephen Reckenmacher and Brian Reckenmacher, who are a father-son team, they work together out of the same location, had been in communication with ODATA for many months before they left. They left on December... They resigned on December 23rd. They had been in communication with ODATA since at least September. And in the course of those communications, and this is all record evidence, the Reckenmachers, and specifically Stephen Reckenmacher, had sent information to ODATA that was clearly a proprietary information of my client. It was not public information pertaining to a number of customers, not just seven customers, but well over 40 customers. When you add it all together, there was quite a few customers that were involved in this information that Mr. Reckenmacher sent. In addition to that, it was very clear from the record that ODATA had known that Mr. Reckenmacher would be sharing this information because ODATA and the Reckenmachers entered into a confidentiality agreement in which Reckenmacher told them that he'd be giving them confidential information. Now, of course, the only confidential information Reckenmacher had was Inova's information. He didn't have his own confidential information to share. So it was clear that ODATA and the Reckenmachers, specifically Stephen, but his son works with him, together essentially misappropriated  clearly did, and there's record evidence of that. We actually submitted a lot of that information in the record before the district court and also use that information. There was record evidence that the district court relied on that Stephen Reckenmacher had met with Inova clients on two occasions and had referenced information that he had sent to ODATA, specifically information about deployment of tanks as an oil tank business, a tank monitoring business, information about the deployment of oil tanks and monitoring devices on those tanks that Inova was using, information about when Inova's oil tanks or monitoring devices would sunset, would become obsolete, which is, again, different for every device. It's not public information when this information is, when these devices are going to become obsolete. That information is very valuable to ODATA because ODATA wants to go to those customers and did and say, look, your Inova device is about to expire. Why don't you replace it with one of our devices? So the exact timing of when these devices would expire was, of course, very important. To ODATA to learn and Mr. Reckenlocher shared that information with them. There was also evidence that both Reckenlochers accessed proprietary databases of Inova before they left to join ODATA. And specifically, we saw that some of those databases, it appears Mr. Reckenlocher printed information out and sent it by email to the CEO and the senior sales director of ODATA. So we saw information of access for inappropriate use. We saw evidence of sending the information. We saw evidence of using the information. Now, did that pertain to all of the customers on the injunction list? It did not. As I said, it pertained to a substantial number of them. But the reason why the injunction list came to be what it was was that we were attempting to capture those customers that the Reckenlochers either were responsible for. In other words, they were paid based on sales to those customers. They were in their territory or they were in customers about whom they had gained information that they had then shared with ODATA. So when we looked at the customers that Inova has, I mean, the Reckenlochers are very senior employees responsible for the entire Western region of the country. They have a lot of customers. The intent was to include those customers, the ones that the Reckenlochers had and used were most likely to use information regarding to target those customers for the anti-solicitation directive. Now, the court did say that to the extent that there were ODATA customers that were substantial ODATA customers on that list, that ODATA should provide evidence of that and that we could negotiate that list. And if necessary, there'd be additional motion practice before the district court. The motion practice that my adversary referred to did not really result from a full record. It resulted from a selection of a few emails and other documents that really didn't show substantial business. And as a result, that motion was denied. Now, he can always revisit the issue. We're still in discovery. Discovery's been going on for a number of months. There's no reason why he couldn't revisit the issue before the district court. I think the district court would be open to that. And we can obviously have negotiations. I'm just trying to underscore. Let me ask you about, so you're 180 folks. You acknowledge there's people on there that were previously customers of OtaData? Actually, I don't acknowledge that because I don't believe that OtaData has established that in the evidence that they put forward when they brought their motion, which, by the way, they brought two days after the injunction order was issued. So what they really did was they selectively provided some information, a couple of invoices, some emails about- So do you acknowledge that there's, I think you said earlier that these were all clients of the Redenbachers and but not everybody, not Redenbachers hadn't served all 181 of those folks when they worked at- they hadn't bought from them when they- not all of them when they bought, when they worked at your company, your representative. Well, Your Honor, the evidence that we have is that, in fact, when those customers purchased Innova products, the Redenbachers did earn commissions from those purchases. That's why they were Reckenmacher clients. We don't- I mean, when this preliminary injunction was entered, obviously we're at the beginning of the case and we're not at the end. So we're not in a position to say with authority, you know, how many of those 181 there was never any business done with, but the idea was to capture the ones that they were responsible for. That was the entire- Here's the challenge in this case. I think you have a very overbroad injunction. You do. You pretty much acknowledge that when you were in front of the district court, when you were in front of Judge Jones, he asked about, well, what if the order is so broad it's covering existing clients of Otadata? And then you said, well, by definition, I think it would only pertain to those customers that they serviced and that Innova customers that weren't currently Otadata customers. But once you got the injunction from Judge Jones and he sort of walked away, I think you were happy to have this overbroad injunction. And so you- I mean, the problem is you've got an overbroad injunction. These guys did some bad things. Judge Jones did what he has a tendency to do and sort of gave rough justice. But injunctions aren't to punish people, right? So that's the problem. You have this overbroad injunction and you basically stopped dealing, even though Judge Jones told you to deal with them, essentially. He actually, you know, he told you to go figure out with them this, right? And you're just basically- it's good for your client to have them not be able to talk to any of these 181 clients. And so you're just sitting on it as long as you can. Well, Your Honor, I don't agree with that. Let me be very clear about this. Literally the day after that injunction came out, Otitidis Council said, we want you to take 130 names off the list, provided no evidence of why. No evidence of why. Just said, we'd like you to do it. And the reason they said is because, well, most of them aren't Reckon Mocker clients, but they didn't provide any evidence of that either. We have evidence they were Reckon Mocker clients. They didn't have that evidence. They weren't other than their say-so. So were we supposed to say, OK, we'll accept your say-so? I mean, no, we- Your Honor, this is Judge Fletcher. Sorry. As I understand the case, it's not only the clients of the two Reckon Mockers, but it's also- they also got information as to other clients that weren't their own with respect to sunset data for particular devices. Is that right? Or was it only as to their own clients? Well, the list is primarily the clients that were serviced by the Reckon Mockers. There are some clients that they had information. They took information concerning that are on that list as well. But they're mostly the Reckon Mockers clients. But as to some of those, as to those that are not Reckon Mocker clients, did they transmit information about those clients that would be useful to photo data that is confidential information? Yes, they did. And those are- there are 17 Canadian clients. We have a document that actually embodies the information that they sent. 17 or so Canadian clients. I might be slightly off on the number. That we're not- they're not Reckon Mocker. My question for Judge Jones is sort of who bears the burden of proof as to what's been transmitted or what's not been transmitted and sort of what do you- if you're going to be safe on one side or the other, on whose side do you call it safe? Yeah. Well, Your Honor, if I could, there are other cases, the Ninth Circuit, particularly my systems, MAI, which have upheld injunctions against soliciting clients in situations where there is evidence of misconduct and the misappropriation of trade secrets. The Gallagher case that my adversary refers to is a case specifically where there was no evidence except circumstantial evidence of misappropriation of customer information. The same is true with the Galante case as well. Those are cases where the evidence of wrongdoing, what was lacking, not to suggest that this is an injunction intended to punish. However, when a former employee in contravention of his clear and known duties does intend to harm his former employer in aid of a new employer, that is conduct that can appropriately be enjoined. The imminent harm there is palpable and there are cases that recognize that, including my systems, including a case that the district court relied on in the second circuit. Doesn't everybody who, I mean, if you take a new job with another competitor, I mean, what's the difference between harm and just and competing against your former employer? It seems to me that's not built in. No, I don't think in every case somebody actually specifically goes and, as the evidence here suggested, tells their current employer's customers, why don't you buy some stuff from Oda Data? In fact, they're part of our company. There's an email, it's part of the record in which the record marker says that. I mean, that's not normal and typical employee leaving conduct. That is misconduct. Yeah, so there's a lot of problems here, including that their markers were, you know, it looks to me like for several months when they were receiving a paycheck from Inova, they were actually soliciting folks for their future employer. One question I've got about this is we've got this. This is all, this stage of the case is all about this. These injunctions and are they all overbroad and such? But am I right in thinking that, I mean, there's going to be a lawsuit about the damages. This lawsuit is going to continue on. It's going to be a lawsuit about the damages that your client has suffered from not just these activities of sending it, but what they were doing during the time when they were working for your client while they were actually helping. Is that all going to be, I mean, there's going to be a lawsuit where presumably you're going to make the case that they owe that both the Redenbachers and Odadat owe your client money for all of this. Is that right? Not just the injunction, but money. Well, the lawsuit is continuing and it will ultimately cover the topic of damages to the extent there were damages caused by the conduct. Well, excuse me. I don't quite understand why you can't just all sit down and straighten this out. Judge Jones seems to want to enter an injunction that covers the proper territory and recognizes that this may be too broad. Are you taking the position before Judge Jones that he shouldn't do anything until we do something? Or what's keeping you from just sitting down maybe with the judge and narrowing the injunction? Well, Your Honor, nothing's keeping me. I think that same question could be asked of the other side. I mean, they clearly have the incentive to do that as well. But they claim that they have made that motion. However, as I said, that motion that they claim they made was made literally the day after the injunction was entered on almost no evidence. And it was largely on their say-so. So to the extent that we want to look at what the evidence is of who the customers are and the like, obviously that is something the respondents are perfectly capable of advancing. There's nothing stopping them either. That's not exactly true, Mr. Duggan. They went to Judge Jones right afterwards, which I think just shows diligence. They said, you know, because Judge Jones had sent all kinds of signals that this is sort of an overbroad list, but we're going to narrow it down. And then you guys opposed that. And then Judge Jones waited until they said we're going to appeal. They didn't appeal for like a month or something. Then they sought an emergency appeal. Then Judge Jones, after that, said, well, I can't do anything because my hands are tied. Then our court said, no, your hands aren't tied. And Judge Jones just sat on it. So I don't think you can say that they haven't been diligent in trying to get this narrow. I think what's more accurate is that once you got the injunction, that you were very happy to just sit there and wait until Judge Jones takes out. Your Honor, if I can, I know my time is up, but if I can just respond to that question, they had an opportunity to put in a lot of evidence to support their position. They put in almost none. Your Honor, we have to grapple with the evidence. They have the evidence if they if they want to to put in, but they didn't put it in. There was very little evidence and there was not evidence supporting the position they're taking now, which is most of the customers shouldn't be on the list. I'm sorry, Your Honor, for going over. Thank you. Any further questions from the bench? All right, thank you very much. So you've saved some time, Mr. Smith. Thank you very much, Your Honor. Let me address immediately the last point that was made that we supposedly never put on any evidence. That's simply false. There's an unrebutted two different declarations from Andre Boulay, where he goes through the clients that were OData clients long before they ever met the Reckonmachers. He attaches he declares in that every single name at issue, which is over 42 clients. He then states with respect to the largest of those clients what the actual volume of business was in one of the in a paragraph for both of those declarations. He then attaches to both of those declarations invoice after invoice after invoice. It's not a Mr. Dickinson quote couple invoices. It's something like 30 invoices, not a couple of invoices. And it corroborates every statement made in Mr. Boulay's declaration. So there was that evidence. In addition, we put in the evidence of our customer list, which has thousands of names on it. These customer lists, they were they were authenticated and it was declared that they were obtained from publicly available sources where you get these customer lists. And the most common of those are trade show lists in this business. This is the tank monitoring business. So they have trade shows around North America from time to time. And you basically buy a list of who's attending. That list shows that 122 of the names out of the 181. And we cite to the excerpts of record where this is shown are on this list. So there was plenty of evidence. And at no point in time did ANOVA actually contest any single part of it. So there is plenty of evidence in the record on this issue. And we were diligent in terms of presenting it to the court. Mr. Smith, can I can I get you to what I'm trying to get my head around is how impactful is it to your client, this 181? It does seem like it's overbroad. You've been this injunction went in earlier this year. I guess early in the year, February or January or something. It went in the first one, I think, went in in late February. The TRO that was. So they have you haven't been able to your client, I assuming, is following the injunction. And so it's basically like hands off, not talking to 181 potential customers, some of which were former clients. What portion of your client's customer base is that? Are these bigger clients, smaller clients? Most of them are actually not bigger, Your Honor. That's why we had a separate paragraph in Mr. Boulay's declaration at the beginning of his declaration. Paragraph three or four, where he lays out the biggest ones to show that those are the ones that are the most impactful. But a lot of these 181 companies are admittedly small. At least we believe in my clients told me they're small. But with respect to the large ones, yes, it is impactful. So it's kind of one of those situations where it's not the number that's all large. It's some within that number are incredibly important. In addition, Your Honor, I'd like to make this point that Mr. Dugan said that the Reckonmachers either serviced or received money or commission from these clients. But if you actually look at the title of the document, the list, it says list of Inova customers who the Reckonmachers serviced or whose name became known to the Reckonmachers during their employment with Inova and or through their misappropriation of Inova's confidential and trade secret information. Names who became known to. And in fact, we did meet and confer with Mr. Dugan about this. We sent a letter to him. I sent a letter to him where I listed that all of these clients whose names became known to the Reckonmachers that the vast majority of them were not clients that the Reckonmachers ever serviced at all. What is it, Mr. Smith? What is it that you want this court to do? To reverse and remand with directions. If the district court is going to issue some kind of injunction that we actually do this process. I've tried to do this process both before the order was issued and after the order was issued. This court even told District Court Jones that he had erred in concluding that he didn't have jurisdiction to do it. Even then, he didn't consider it. So I do think we were diligent. So it should be reversed for the reasons stated in our brief. But with instructions to reconsider the issue if some injunction is appropriate. With my 15 seconds left, though, I would say there's no injunction that's appropriate against Brian Reckonmacher. And there really shouldn't be any injunction beyond the trade secret injunction itself against OTA data. Can I ask you about that? Without your honor. Yes, let's hear. Can I ask about the Brian Redenbacher? So why, you know, you've emphasized that here. You emphasize that in the briefs. Why do you care that Brian Redenbacher not be covered by the injunction? I mean, at least an injunction that said don't let's say don't share the trade secrets. Why do you care? I mean, he would be. It almost sounds a little suspicious that you all we really want this other person not to be covered by. What's your reason for that? The main reason is I'm his lawyer, your honor. I agree with if you're making the point that if he's working for OTA data, it doesn't make much make a difference if there's still an injunction against OTA data. I agree with that, your honor. But he may decide to quit and not work for OTA data someday. And I just am in the unfortunate position of representing all three defendants. And I feel like it is my obligation. So that's the last argument in the brief. It is my obligation on behalf of Brian Redenbacher to say there simply wasn't any evidence against him. The only evidence against him was that he looked at ANOVA information before he quit. That's it. But I see your point, your honor. Is Brian working now for OTA data? Yes, Brian and Stephen are still working for OTA data, but they can't do much. Given the relationship between father and son and the facts that we know that the injunction against Brian is perfectly warranted. Yeah. Isn't Brian like, yeah, that's why I was asked to quit. Brian's like is in his father's house or something working, right? Like they work like very closely. They do work very closely. I don't know if he's literally in his house. But yes, I can see that they work as a team up to this point in time. But I see your point about if he if he was to go to work for somebody else that OK. Right. Revise the injunction to say for so long as you work for OTA data, but while he's working for OTA data, I see no grounds for keeping Brian out of the injunction. That may be fair, your honor. Again, I wasn't trying to say that in the context of OTA data, whatever the injunction is against OTA data, that might be fair, which would be either no injunction or a much narrower injunction. Brian as OTA data, I agree. I don't I don't. And I'm not and I wasn't trying to make that distinction. OK, thank you. OK, any further questions from the bench? OK, thank both sides for the argument. Independent technologies versus OTA data wireless network submitted for decision. Thanks very much. Thank you, your honors. Thank you, counsel. Thank you, your honor.
judges: Schroeder, W. Fletcher, Vandyke